# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MICHELLE BAILEY and MICHAEL JETT, individually and on behalf of themselves and all others similarly situated,<br><br>                      Plaintiffs,<br>v.<br><br>ADVANCEPIERRE FOODS, INC., TYSON FRESH MEATS, INC., and TYSON FOODS, INC.,<br><br>                      Defendants. | Case No. 1:23-CV-01537<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Michelle Bailey and Michael Jett ("**Plaintiffs**"), by their undersigned attorneys, on their own behalf and on behalf of all others similarly situated, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, bring this First Amended Complaint against AdvancePierre Foods, Inc. ("**AdvancePierre**"), Tyson Fresh Meats, Inc. ("**Tyson Fresh Meats**"), and Tyson Foods, Inc. ( "**Tyson Foods**" and collectively with AdvancePierre and Tyson Fresh Meats either "**Tyson**" or "**Defendants**") for their violations of Plaintiffs' privacy rights guaranteed under the Illinois Genetic Information Privacy Act, 410 Illinois Compiled Statute ("**ILCS**") 513 *et seq.* (hereinafter "**GIPA**"), and allege as follows:

## NATURE OF THE ACTION

1. Unlocking the human genetic code came with it the potential for hitherto unfathomable medical development. It permitted individuals to learn in detail the possibilities that were hidden within their genome. For the first time, women can now learn whether they are predisposed to get breast cancer; families can trace their genetic lineage back thousands of years, and law enforcement can use DNA samples to identify criminals.

2. However, all of this information can only be obtained if people are willing to allow sharing of genetic information, and that is only possible if people know that their genetic information will not be used against them in future employment, insurance or other situations. For example, few women would want to learn about a predisposition to breast cancer if that meant that they could be barred from certain jobs or prevented from obtaining life insurance.

3. The Illinois Legislature enacted GIPA in 1998 with the goal to protect Illinois residents from having their genetic information being used against them in employment settings.

4. Consistent with this goal, GIPA provides strong legal protections to ensure that Illinois residents can take advantage of the knowledge that can be gained from obtaining personal genetic information, without fear that this same information could be used by employers to discriminate against them.

5. Among its other valuable protections, GIPA prohibits employers from learning or using genetic information in making employment decisions. GIPA bars employers from asking about employees or potential employees' genetic information, prevents employers from obtaining this information from third parties, and forbids employers from using such information to affect the terms and conditions of employment.

6. To accomplish this goal, GIPA employs a comprehensive definition of "genetic information" that includes information regarding an individual's family medical history.

7. Despite GIPA's prohibitions, some companies in Illinois still ask their employees or applicants to provide protected family medical history when making hiring determinations and job assignments in blatant violation of the law.

8. Defendants chose to repeatedly disregard Illinois' genetic privacy laws by asking its employees to provide genetic information in the form of family medical history to assist the company in making employment decisions.

9. Accordingly, Plaintiffs seek on behalf of themselves, and all of Defendants' other similarly situated employees in the state, an order: (i) requiring Defendants to cease the unlawful activities discussed herein; and (ii) awarding actual and/or statutory damages to Plaintiffs and the members of the proposed Class.

## PARTIES

10. Plaintiff Michelle Bailey was at all relevant times employed by AdvancePierre and is an individual citizen of the State of Illinois. Ms. Bailey currently resides in Roxana, Illinois.

11. Plaintiff Michael Jett was at all relevant times employed by Tyson Fresh Meats and is an individual citizen of the State of Illinois. Mr. Jett currently resides in Moline, Illinois.

12. Defendant Tyson Foods, Inc. is a Delaware corporation with its headquarters located in Springdale, Arizona. Tyson Foods conducts business throughout this District, the State of Illinois, and the United States.

13. Defendant Tyson Fresh Meats, Inc. is a Delaware corporation and is a wholly owned subsidiary of Tyson Foods. Tyson Fresh Meats is headquartered in Dakota Dunes, South Dakota and conducts business throughout the State of Illinois and the United States.

14. Defendant AdvancePierre Foods, Inc. is a Delaware corporation and is a wholly owned subsidiary of Tyson Foods. AdvancePierre is headquartered in Cincinnati, Ohio, and conducts business throughout the State of Illinois and the United States.

15. Tyson Foods' subsidiaries, like AdvancePierre and Tyson Fresh Meats, are major employers in the state of Illinois, with over one thousand employees in the state in total. Tyson

3

Foods operates throughout Illinois in multiple locations. These include AdvancePierre's food processing plant at 12 Tucker Drive, Caseyville, IL 62232[1] ("**the Caseyville Plant**") and Tyson Fresh Meats' food processing plant at 28424 38th Avenue N, Hillsdale, IL 61257 ("**the Joslin Plant**"), as well as a Tyson distribution center in Rochelle, Illinois and Tyson Foods' corporate offices in Chicago, Illinois.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

17. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the parties are diverse and the amount in controversy exceeds the requisite threshold.

18. This Court has jurisdiction over the Defendants because they conduct business in this District, and a substantial part of the unlawful events and practices which give rise to this action occurred in this District.

19. This Court may exercise jurisdiction over the Defendants because they have sufficient minimum contacts in Illinois and purposefully avail themselves of the markets within Illinois through the processing and distribution of their products, and hiring of employees, thus rendering jurisdiction by this Court proper and necessary.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred within this judicial district and

---

[1] https://www.fsis.usda.gov/inspection/fsis-inspected-establishments/advancepierre-foods-inc

because Defendants have conducted the unlawful practices at issue in this action within this judicial district and have done business within this judicial district. Venue is also proper in this court pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are subject to the Court's personal jurisdiction with respect to this action.

## ILLINOIS GENETIC INFORMATION PRIVACY ACT ("GIPA")

21. During the 1990's the U.S. government poured billions of dollars into the Human Genome Project in an attempt to map the entire human genetic code. When President Clinton announced the first successful "rough draft" of the Project in 2000, he hailed it as one of the great achievements of human history, and said: "Today we are learning the language with which God created life[.]"[2]

22. However, like any great leap in human understanding, learning the meaning of people's genetics came with many concerns. One movie released around this time, the dystopian science fiction movie *Gattaca*, attempted to show how this new technology could be abused. The movie conjured a not-too-distant future where genetic discrimination was rampant. In the movie, companies segregated people based on their genetic profiles, those with better genetic profiles (i.e., genetically engineered humans) were eligible for professional employment, while others with less desirable genetics (e.g., susceptibility to heart disease or cancer) were unemployable or relegated to menial jobs. Since its release, the film has been regularly used in schools to show the possible misuses of genetic information.[3]

---

[2] *Scientists Complete Rough Draft of Human Genome* (N.Y. Times June 26, 2000) *available at* https://archive.nytimes.com/www.nytimes.com/library/national/science/062600sci-human-genome.html?amp;sq=francis%252520collins&st=cse&scp=23.

[3] *What Do People Who Work in Genetics Think About Gattaca 25 Years After Its Release* (Slate Aug. 15, 2022) *available at* https://slate.com/technology/2022/08/gattaca-25th-anniversary-genetics-crispr.html.

5

23. Illinois stood at the forefront of protecting its citizens from the abuse of this technology when it first passed GIPA in 1998. According to the Illinois Legislature, the intent of GIPA is to protect an individual from their genetic information (such as family medical history) being used against them in a discriminatory manner. Limiting the use or requests for protected genetic information is a key component of health information privacy. 410 ILCS 513/5(1)-(5).

24. The Illinois Legislature amended GIPA in 2008 to increase its protections and harmonize Illinois state law with the then-recently passed Federal Genetic Information Nondiscrimination Act of 2008 ("**GINA**"), 110 P.L. 233; *see also* 42 U.S.C. § 2000ff. The 2008 amendments to GIPA sought to further prohibit discriminatory practices of employers through the use of genetic information of employees, including such employees' family medical history.

25. During discussions of the 2008 GIPA amendments, the Illinois Legislature recognized the importance of safeguarding family medical history due to the fact that it is akin to knowledge of genetic predispositions:

> I hope the [legislature] understands the importance of [family medical history]; it's becoming more and more important. Back in '96 or '97, I had a third generation ovarian cancer survivor that came to me with this issue. … If a woman has … the gene that causes breast cancer, she can have up to an 84 percent probability that she will develop breast cancer sometime in her life … it's important that we help people be able to know that information and know they won't be discriminated against in their employment …. Quite honestly, with genetic information we have today, we could identify a pool of people that … no one would want to employ. [GIPA] helps guarantee that we don't have that kind of discrimination occur.

Illinois House Transcript, 2008 Reg. Sess. No. 276, pp. 33-34.

26. To accomplish the Illinois Legislature's goal of ensuring that genetic information is not used to discriminate against employees, GIPA adopted Congress' definition of "genetic information" that includes not just the narrow results of an individual's genetic tests, but also

6

information regarding "[t]he manifestation of a disease or disorder in family members of such individual[.]" 410 ILCS 513/10; *see* 45 C.F.R. § 160.103.

27. GIPA bars employers from directly or indirectly requesting or using genetic information in hiring, firing, demoting, or in determining work assignment or classifications of applicants or employees. Specifically, GIPA states: "An employer … shall not directly or indirectly do any of the following:

> **(1)** solicit, request, require or purchase genetic testing or genetic information of a person or a family member of the person, … as a condition of employment, preemployment application…;
>
> **(2)** affect the terms, conditions, or privileges of employment, preemployment application, … or terminate the employment, … of any person because of genetic testing or genetic information with respect to the employee or family member…;
>
> **(3)** limit, segregate, or classify employees in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee as an employee because of genetic testing or genetic information with respect to the employee or a family member, …; and
>
> **(4)** retaliate through discharge or in any other manner against any person alleging a violation of this Act or participating in any manner in a proceeding under this Act.

410 Ill. Comp. Stat. 513/25(c). Nor may an employer or prospective employer enter into an agreement with a person to take a genetic test. 410 ILCS 513/25(d).

28. Even if an employer otherwise obtains genetic information lawfully, it still may not use or disclose the genetic information in violation of GIPA. 410 ILCS 513/25(j).

29. In order to enforce these and other requirements, GIPA provides individuals with a broad private right of action, stating: "Any person aggrieved by a violation of this Act shall have

a right of action … against an offending party." 410 ILCS 513/40(a). Under this private right of action, a party may recover, for each violation: (a) $2,500 or actual damages, whichever is greater, for a negligent violation, or $15,000 or actual damages, whichever is greater, for a willful violation; (b) reasonable attorneys' fees; and (c) "[s]uch other relief, including an injunction, as the … court may deem appropriate." *Id.*

30. Plaintiffs are not required to allege or prove actual damages in order to state a claim under GIPA, and they can seek statutory damages under GIPA as compensation for the injuries caused by Defendant. *See Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, at ¶ 40, 432 Ill. Dec. 654, 129 N.E.3d 1197 (holding by the Illinois Supreme Court that "an individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under [the Illinois Biometric Privacy Act ("**BIPA**")] in order to qualify as an 'aggrieved person' under BIPA); *see also Bridges v. Blackstone Grp., Inc.*, 2022 U.S. Dist. LEXIS 121205, at *8 (S. D. Ill. July 8, 2022) (holding that it is appropriate to apply BIPA's definition of "aggrieved person" used by the *Rosenbach* court to alleged violations of GIPA).

31. Thus, GIPA provides valuable privacy rights, protections, and benefits to the citizens of Illinois and provides those citizens with the means to aggressively enforce those rights.

## PLAINTIFF SPECIFIC ALLEGATIONS

### PLAINTIFF MICHELLE BAILEY

32. In or around October 2018, Plaintiff Michelle Bailey began working at AdvancePierre's Caseyville Plant through a temporary employment agency.

33. In or around January 2019, Ms. Bailey submitted an application for the full-time, permanent position of Shipping Checker Laborer at the Caseyville Plant.

34. In or around January 2019, during the application and hiring process, AdvancePierre, pursuant to a Tyson Foods' policy, directly solicited, requested, or required Ms. Bailey to disclose her family medical history.

35. Specifically, on January 22, 2019, Ms. Bailey was required to submit to a pre-employment physical as a requirement of the hiring process. The physical was conducted at the Caseyville Plant by Katrina Hearn, RN ("**Nurse Hearn**"), who was an employee of AdvancePierre at the time. During the physical, Nurse Hearn verbally solicited, requested, or required Ms. Bailey to disclose her family medical history.

36. Nurse Hearn asked Ms. Bailey to prepare handwritten responses to paperwork which asked about her medical history, including hypertension and heart-related issues, among other ailments. After completing the paperwork, Ms. Bailey met with Nurse Hearn one-on-one in a physical examination room within the medical offices at the Caseyville plant. Ms. Bailey recalls that the room contained a desk on the left side of the room and on the right side of the room was a medical bed similar to those used at a hospital. Adjacent to the bed was a chart used for eye exams and a counter containing medical supplies.

37. During this examination, Nurse Hearn tested Ms. Bailey's eyesight and the flexibility of various body parts. After completing the physical portions of the examination, Nurse Hearn verbally asked Ms. Bailey questions about her medical conditions and history. When asking these questions, Nurse Hearn had a file in front of her on her desk and she made handwritten notes on the papers in the file as she asked these questions.

38. Among other questions, Nurse Hearn verbally asked Ms. Bailey to provide her family medical history. Nurse Hearn listed various medical conditions and asked Ms. Bailey to respond by stating whether Ms. Bailey had any of those conditions, or whether any family

9

members on Ms. Bailey's maternal or paternal bloodlines had these conditions. These medical conditions included cardiac health and cancer.

39. In response, Ms. Bailey disclosed genetic information, including conditions that her family members had been diagnosed with. Ms. Bailey would not have volunteered her family members' medical histories if Nurse Hearn had not asked Ms. Bailey to do so.

40. Ms. Bailey was not directed by Nurse Hearn, or anyone else from AdvancePierre, either verbally or in writing, to not disclose the solicited genetic information. Nor did Ms. Bailey provide prior, knowing, voluntary, and written authorization to AdvancePierre for the use of her genetic information in furtherance of a workplace wellness program.

41. The results of the exam conducted by Nurse Hearn were used by AdvancePierre to affect the terms and conditions of Ms. Bailey's employment.

42. Ms. Bailey was hired by AdvancePierre for the Shipping Checker Laborer position after completing all required steps in the hiring process. Ms. Bailey's job duties included picking up and moving rolls of film weighing approximately fifty (50) pounds for industrial machinery which utilized the large rolls of film to package food products processed by Defendant. She also handled labels for the food products, ordered the film and labels to be used in the packaging process, and operated the machinery in accordance with the Caseyville Plant's production schedules.

43. Ms. Bailey left AdvancePierre's employment at the Caseyville Plant in or around August 2019.

**PLAINTIFF MICHAEL JETT**

44. In or around July 2021, Plaintiff Michael Jett submitted an application to Tyson Fresh Meats for the position of General Laborer at the Joslin Plant.

10

45. In or around July 2021, during the application and hiring process, Tyson Fresh Meats directly solicited, requested, or required Mr. Jett to disclose his family medical history pursuant to a Tyson Foods' policy.

46. Specifically, on July 14, 2021, Mr. Jett was required to submit to a pre-employment physical as a requirement of the hiring process. The physical was conducted at the Joslin Plant by Sherri Dickey, LPN ("**Nurse Dickey**"), an employee of Defendant Tyson Fresh Meats at the time. During the physical, Nurse Dickey verbally solicited, requested, or required Mr. Jett to disclose his family medical history.

47. Initially, Nurse Dickey had Mr. Jett provide a sample for drug testing. Mr. Jett then completed a health questionnaire which requested information about his medical health history. After completing the questionnaire, Mr. Jett met with Nurse Dickey in an examination room for a physical. The examination room was similar to that of a doctor's office and contained a hospital bed inside of it. No other persons were present in the room other than Mr. Jett and Nurse Dickey.

48. During this physical examination, Nurse Dickey instructed Mr. Jett to complete various tests of his eyesight and body parts, such as his shoulders and wrists. Nurse Dickey then verbally asked Mr. Jett additional questions about his medical conditions and history. Among other things, Nurse Dickey asked Mr. Jett to provide the medical history of himself and his family members regarding various medical conditions, including cancer and cardiac health.

49. Mr. Jett felt that the questions regarding his family medical history were irrelevant to his application for employment. He did not understand why Nurse Dickey was asking him to provide this information and he did not provide his family medical history in response to the questions.

50. Mr. Jett was not directed by Tyson, either verbally or in writing, to not disclose the solicited genetic information.

51. Mr. Jett was required to undergo the physical examination and was asked to disclose his genetic information as a condition of employment with Tyson Fresh Meats. The results of the physical were used by Tyson Fresh Meats to affect the terms and conditions of Mr. Jett's employment.

52. Mr. Jett was hired by Tyson Fresh Meats for the General Laborer position after completing all required steps in the hiring process. Mr. Jett's job duties involved strenuous physical labor involved with the production of Defendants' food products and required Mr. Jett to stand for eight (8) hours per day, have good hand/eye coordination, and to be able to push, pull, carry and/or lift items weighing in excess of forty (40) pounds.

53. Mr. Jett was employed by Defendant at the Joslin Plant until in or around October 2021.

54. In or around February 2022, Mr. Jett was rehired by Tyson Fresh Meats at the Joslin Plant for the same position he previously worked.

55. On February 6, 2022, Mr. Jett underwent another pre-employment physical at the Joslin Plant conducted by Nurse Dickey. Mr. Jett was once again asked verbally by Nurse Dickey to provide genetic information, including family medical history. In response, Mr. Jett again did not disclose genetic information.

56. Mr. Jett never provided prior, knowing, voluntary, and written authorization to Tyson for the use of his genetic information in furtherance of a workplace wellness program.

## TYSON FOODS DIRECTED ITS SUBSIDIARIES TO COLLECT GENETIC INFORMATION FROM PROSPECTIVE EMPLOYEES

57. Tyson Foods is a large public company with many subsidiaries. On information and belief, these subsidiaries share certain resources, and are ultimately controlled by Tyson Foods, which sets policies for the entire company.

58. Among other things, Tyson Foods maintains certain companywide policies. Some of these policies are publicly available on its web site, including its Code of Conduct, which "outlines expected behaviors for all Tyson team members and members of the Board of Directors (Directors)."[4]

59. Tyson Foods' public securities filings describe the company's central oversight of its health and safety policies and programs. For example, the company's Form 10-K for 2022 stated that the company "created and implemented processes to help identify and eliminate safety events by reducing their frequency and severity" and they "review and monitor [the company's] safety performance closely."[5] It also states that the company has a Chief Medical Officer and "[a]s an expansion of our wellbeing culture and efforts to boost the overall health and wellness of our workforce, we continue to pilot health clinics near our production facilities" … "we have approximately 600 occupational health nurses and administrative support staff to assist in our ongoing efforts to protect frontline team members during the COVID-19 pandemic while also enhancing our culture of health, safety and wellbeing."[6]

60. Consistent with Tyson Foods' central control of health and wellness issues, upon information and belief, Tyson Foods' employees or agents directed individuals at AdvancePierre

---

[4] https://www.tysoncodeofconduct.com/introduction/code-of-conduct/
[5] Tyson Foods, Inc. Form 10-K, p.6 (Nov. 14, 2022) *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0000100493/1ab12235-2b12-47a5-acb0-a257e74d04a2.pdf.
[6] *Id.*

and Tyson Fresh Meats to implement policies and practices regarding the pre-employment physicals conducted at the Caseyville Plant and the Joslin Plant respectively, including but not limited to, the solicitation of family medical histories from individuals undergoing the physicals.

61. The written forms utilized by AdvancePierre and Tyson Fresh Meats for pre-employment physicals were the same. This further evidences that Tyson Foods directed both of its wholly owned subsidiaries' policies and procedures regarding the pre-employment physicals for prospective employees throughout the State of Illinois.

### TYSON VIOLATES GIPA AS A MATTER OF COURSE

62. Based on Plaintiffs' experience, they believe that, during the hiring process, Tyson asks employees and/or prospective employees to provide family medical histories as a condition of employment and/or as part of its hiring process.

63. Plaintiffs understand, on information and belief, that Tyson, or agents on its behalf, requests this family medical history information for the purpose of evaluating the risk that the individual may have inherited genetic conditions from family members, and then improperly uses that information when making its hiring decisions and staffing assignments.

64. On information and belief, Tyson requests this family medical history information as part of an effort to avoid risk and/or liability for workplace injuries and/or deaths caused by genetic conditions, including but not limited to hypertension, cancer, heart conditions, diabetes, and stroke, which Tyson believes could be inherited and that could be exacerbated by workplace conditions, especially if these conditions are high-stress and/or physically demanding.

65. Tyson was or should have been aware of its obligations under GIPA. Nevertheless, Tyson intentionally and/or recklessly captured, collected, and/or retained Plaintiffs' genetic information in the form of their family medical history in violation of Illinois law.

66. As a result, Tyson's violation was willful because it knew, or reasonably should have known, that it was failing to comply with the above-described requirements of GIPA.

## CLASS ACTION ALLEGATIONS

67. **Proposed Class Definition**: Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class (the "**Class**") of similarly situated individuals, defined as follows:

68. The Class brought by Plaintiffs consists of:

> All individuals, from March 13, 2018, to the date of class certification of this action, (1) who applied for employment with Defendants or were employed by Defendants in Illinois, and (2) from whom Defendants, or an agent acting on behalf of Defendants, requested and/or obtained genetic information, including family medical history, in connection with the person's application for employment or the person's employment with Defendants.

Excluded from the class are Defendants' officers and directors, Plaintiffs' counsel, and any member of the judiciary presiding over this action.

69. Plaintiffs reserve the right to modify this class definition as they obtain relevant information, including employment records, through discovery.

70. **Numerosity:** The exact number of class members is unknown and is not available to Plaintiffs at this time, but Defendants employ over one thousand people in Illinois, and it is believed that all or most of those individuals will fall within the proposed Class. Therefore, it is clear that individual joinder in this case is impracticable. Proposed Class members can easily be identified through Defendants' employment records.

71. **Common Questions:** There are several questions of law and fact common to the claims of Plaintiffs and the proposed Class members, and those questions predominate over any

15

questions that may affect individual proposed Class members. Common questions include, but are not limited to, the following:

    a. whether Defendants, or an agent acting on behalf of Defendants, solicited, requested, captured or collected family medical history of prospective employees;

    b. whether Defendants, or an agent acting on behalf of Defendants, solicited, requested, captured or collected family medical history of existing employees;

    c. whether Defendants obtained genetic information from Plaintiffs and the Class by asking for family medical history;

    d. whether Defendants' solicitation, request, collection, or use of genetic information constituted a violation of GIPA; and

    e. whether Tyson Foods directed and controlled the policies and procedures of its wholly owned subsidiaries, Tyson Fresh Meats and AdvancePierre, with respect to the pre-employment physicals conducted at Tyson's facilities throughout the State of Illinois.

72. **Typicality**: Plaintiffs' claims are typical of the claims of the proposed Class members. Plaintiffs would only seek individual or actual damages if class certification is denied. In addition, Plaintiffs are entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

73. **Adequacy of Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained competent counsel experienced in complex litigation and class action litigation. Plaintiffs have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

74. **Appropriateness:** Class proceedings are also superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Even if proposed Class members were able or willing to pursue such individual litigation, a class action would still be preferable due to the fact that a multiplicity of individual

actions would likely increase the expense and time of litigation given the complex legal and factual controversies presented in this Class Action Complaint. A class action, on the other hand, provides the benefits of fewer management difficulties, single adjudication, economy of scale, and comprehensive supervision before a single court, and would result in reduced time, effort and expense for all parties and the Court, and ultimately, the uniformity of decisions.

**COUNT I**
**VIOLATION OF 410 ILCS 513/25**
**SOLICIT, REQUEST AND/OR REQUIRE GENETIC INFORMATION OF A PERSON OR A FAMILY MEMBER OF A PERSON AS A CONDITION OF EMPLOYMENT OR PREEMPLOYMENT APPLICATION**

75. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

76. Defendants are corporations that directly or indirectly employ individuals within the State of Illinois and therefore meet the definition of an "employer" under 410 ILCS 513/10.

77. Family medical history includes the "manifestation or possible manifestation of a disease or disorder in a family member of [an] individual" and is incorporated into the definition of "genetic information" under 410 ILCS 513/10 and 45 C.F.R. § 160.103.

78. Plaintiffs were individually asked to provide, and did provide, family medical history as a condition of employment during the application and hiring process to work for Defendants.

79. Defendants, or an agent acting on their behalf, solicited, requested, or required Plaintiffs to disclose family medical history as a condition of employment during the application and hiring process to work for Defendants.

80. Defendants directly solicited or requested Plaintiffs to disclose family medical history during a pre-employment physical as a condition of employment during the application and hiring process to work for Defendants.

81. Defendants failed to direct Plaintiffs, either verbally or in writing, not to provide genetic information when requested to provide their family medical history.

82. Plaintiffs and the proposed Class members were aggrieved by Defendants' violations of their statutorily protected rights to privacy in their genetic information, as set forth in GIPA, when Defendants directly or indirectly solicited or requested them to disclose their genetic information as a condition of ongoing employment or a condition of a pre-employment application.

83. By indirectly or directly soliciting or requesting Plaintiffs and the proposed Class members to provide their genetic information as described herein, Defendants violated Plaintiffs' and the proposed Class members' rights to privacy in their genetic information as set forth in GIPA.

84. Tyson Foods directed and controlled the policies and procedures of its wholly owned subsidiaries, Tyson Fresh Meats and AdvancePierre, with respect to the pre-employment physicals conducted at Tyson's facilities throughout the State of Illinois, and therefore it is vicariously liable for the GIPA violations of its wholly owned subsidiaries.

85. Because Tyson knew, or reasonably should have known, that soliciting or requesting family medical history from an employee in Illinois violated GIPA, its actions in violating GIPA were willful.

86. On behalf of themselves and the proposed Class members, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the proposed Class by requiring each Defendant to comply with GIPA as described

herein; (3) statutory damages of $15,000 or actual damages, whichever is greater, for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2) or, in the alternative, statutory damages of $2,500 or actual damages, whichever is greater, for each negligent violation of GIPA pursuant to 410 ILCS 513/40(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the proposed Class of similarly situated individuals, pray for an Order as follows:

A. Finding this action satisfies the prerequisites for maintenance as a class action set forth in Rule 23 of the Federal Rules of Civil Procedure and certifying the proposed Class as defined herein;

B. Designating and appointing Plaintiffs as representatives of the proposed Class and Plaintiffs' undersigned counsel as Class Counsel;

C. Declaring that Defendants' actions, as set forth above, violate GIPA;

D. Awarding Plaintiffs and the proposed Class members statutory damages of $15,000 or actual damages, whichever is greater, for *each* intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2), or statutory damages of $2,500 or actual damages, whichever is greater, for *each* negligent violation of GIPA pursuant to 410 ILCS 513/40(1);

E. Declaring that Defendants' actions, as set forth above, were intentional or reckless and/or declaring that Defendants' actions, as set forth above, were negligent;

F. Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the proposed Class, including an Order prohibiting Defendants from soliciting, requesting and/or requiring genetic information as a condition of employment or in a pre-employment application pursuant to GIPA;

G. Awarding Plaintiffs and the proposed Class members reasonable attorneys' fees and costs incurred in this litigation pursuant to 410 ILCS 513/40(3);

H. Awarding Plaintiffs and the proposed Class pre- and post-judgment interest, to the extent allowable; and

I. Granting all such other and further relief as the Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a jury trial on all issues so triable.

Dated: June 7, 2023                    Respectfully submitted,

/s/ Edward Wallace
Edward A. Wallace
Mark R. Miller
Molly C. Wells
WALLACE MILLER
150 N. Wacker Drive, Suite 1100
Chicago, IL 60606
T. (312) 261-6193
E. eaw@wallacemiller.com
   mrm@wallacemiller.com
   mcw@wallacemiller.com

Elizabeth Brehm
Kyle McLean
SIRI & GLIMSTAD LLP
745 Fifth Avenue, Suite 500
New York, NY 10151
T. (212) 532-1091
E. ebrehm@sirillp.com
   kmclean@sirillp.com

COUNSEL FOR PLAINTIFFS AND THE PROPOSED CLASS